Donna Marie SCHENCK, a Minor, et al *v.*
Janet KNIGHT, Director of Family Services

73-185 505 S.W. 2d 192

Opinion delivered February 4, 1974
[Rehearing denied March 11, 1974.]

*Frances T. Donovan,* for appellants.

*Ivan H. Smith* and *Louis Watts,* for appellee.

J. Fred Jones, Justice. This is an appeal by Donna Marie Schenck, the minor mother of Patrick Daniel Schenck, and Donna's mother, Mary Ann Brown, as next friend of Donna Marie and grandmother of the infant child, Patrick Daniel Schenck, from a decree of the Garland County Chancery Court denying their petition

for habeas corpus in connection with the custody of the infant child, Patrick Daniel Schenck.

The rather sordid background is somewhat immaterial to the question before us on appeal and much of the evidence is indicative of strong feelings so easily generated in child custody cases of this kind. The appellants' brief begins with the statement: "This is the case of the stolen child, Patrick Daniel Schenck, . . . who was spirited away to a foster home by the Welfare Department, under an illegal order of the Pulaski Juvenile Court." From our examination of the entire record, we do not find this case as simple as the appellants' above statement would indicate.

From the recorded background for this litigation, it appears that Mary Ann Brown is a resident of Faulkner County and is the adopted daughter of Mr. and Mrs. Julian Nabholz who are also residents of Faulkner County. Mrs. Brown is 34 years of age and was first married to Tyrone Presley and they were divorced after two years of marriage. She then married Lawrence Schenck in August, 1957, and four children were born of the union. Upon her divorce from Schenck in 1965, she married Joe Brown from whom she is now separated.

Donna Marie is the oldest of Mrs. Brown's four children and even prior to her separation from Brown, she and her children were dependent upon her elderly mother and father and on state welfare assistance for the bare necessities of life. From Mrs. Brown's own testimony and other evidence in the record, it appears that her youngest child is afflicted with cerebral palsy, and her son, one year younger than Donna Marie, is afflicted with epilepsy.

It appears from the record that by the middle of 1970 Donna Marie was physically developing into young womanhood at an exceptionally early age and was having considerable difficulty with her reading in school. According to Mrs. Brown, Donna Marie had become "boy crazy" and Mrs. Brown became apprehensive about Donna Marie's future welfare in her then surroundings and she sought aid and assistance from the Child Welfare Divi-

sion of the state Welfare Department, which resulted in her relinquishing legal custody of Donna Marie to the Welfare Department with the understanding that Donna Marie would be placed in a suitable orphanage where she would obtain spiritual guidance as well as assistance with her schoolwork. Transfer of custody was accomplished through the written consent of Mrs. Brown and very informal juvenile court proceedings in the Faulkner County Juvenile Court. Through the efforts of the Welfare Department as well as the efforts of Mrs. Brown's mother and father, Donna Marie was placed in a parochial orphanage in Pulaski County where she continued her schooling in public school and was permitted to visit her relatives in Faulkner County occasionally on weekends.

While Donna Marie was still a ward of the state, she became pregnant and was transferred from the orphanage to the Florence Crittenton Home for unwed mothers, where she remained during the last several months of her gestation period. Donna Marie was transferred to St. Vincent Infirmary where her child, Patrick Daniel Schenck, was delivered by caesarean section on October 6, 1971, when Donna Marie was 14 years of age.

The greatest conflict of the evidence in this case has to do with agreements pertaining to the custody of the infant, Patrick Daniel Schenck, prior to and following its birth. Numerous caseworkers and Welfare Department personnel and personnel from the Florence Crittenton Home testified that Mrs. Brown, as well as Donna Marie, and Mrs. Brown's mother and father, agreed, prior to the birth of the child, that it would be to the best interest of all concerned that the child be released for adoption. They testified that Mrs. Brown's mother and father only requested that the adoptive parents should be of the Catholic faith. They testified that clear up until the time of the child's birth, they were under the impression that everyone concerned, including Donna Marie and Mrs. Brown, was agreeable to releasing the child for adoption. This testimony was denied by Mrs. Brown and Donna Marie. They both testified to rather extreme pressure exerted by the personnel of the child Welfare Division of the Welfare Department directed toward the release of the child for

adoption, even to threats of retaining permanent custody · of Donna Marie and never permitting her to return home unless they did agree to release the child for adoption.

In any event, following the birth of the child at St. Vincent Infirmary in Little Rock, the Child Welfare personnel went to the hospital to present release papers for Donna Marie to sign. They testified that when they arrived at the hospital, Donna Marie and her nother, Mrs. Brown, had just seen the baby for the first time; that they were both upset and crying and the release papers were not submitted to them for signing. Both Donna Marie and Mrs. Brown opposed the release of the child for adoption and they both testified they had never agreed to release the child for adoption and never had any intention of doing so.

On October 20, 1971, a petition signed by Jamie Newson was filed in the Pulaski County Juvenile Court alleging Patrick Daniel Schenck to be a dependent and neglected child for the reason:

"That he is without proper parental care and supervision and dependent upon the public for support."

The form petition then prayed that the court declare said child to be dependent and neglected and to:

"[M]ake an order for the welfare of Patrick Daniel Schenck, placing him in the legal custody of the Director of Family and Children's Services, State Department of Public Welfare."

On the same date, October 20, 1971, an order designated "Order of Temporary Custody" was signed by the judge and a referee of the Pulaski County Juvenile Court and it recited as follows:

"This cause coming on for hearing and the Court finds that the said Patrick Daniel Schenck is a dependent and neglected child in that he. is without proper parental care and supervision and dependent upon the public for support.

WHEREFORE it is hereby ordered by this Court that the said Patrick Daniel Schenck, be placed in

the temporary custody of the Director of Family and Children's Services, State Department of Public Welfare, and that said Family and Children's Services, State Department of Public Welfare, be authorized to secure proper medical and surgical care for said child until hearing and further order of the Pulaski County Juvenile Court. Said child not to be removed from temporary custody of the Family and Children's Services without permission of the Pulaski County Juvenile Court."

Apparently, under authority of this order, the director of the Family and Children's Services of the state Department of Public Welfare took custody of the infant child; removed it from St. Vincent Infirmary and placed it in a foster home in Garland County, Arkansas. There are no further proceedings in the record before us pertaining to the Pulaski County Juvenile Court order of October 20, and apparently no appeal was perfected therefrom. (Ark. Stat. Ann. § 45-208 [Repl. 1964]).

On January 11, 1972, upon petition filed by Mrs. Brown in the Faulkner County Juvenile Court, that court's previous order of August 28, 1970, pertaining to the custody of Donna Marie, was set aside and custody reinvested in Mrs. Brown. Then on January 26, 1972, Donna Marie and Mrs. Brown instituted the present litigation by filing their petition for habeas corpus in the Faulkner County Chancery Court against Janet Knight, Director of Family and Children's Services, state Department of Public Welfare. Upon being advised that the child was in a foster home in Garland County, the Chancery Court of Faulkner County dismissed the petition for want of jurisdiction and, in effect, transferred the matter to the Garland County Chancery Court.

The matter proceeded to hearing on the petition for habeas corpus in the Garland County Chancery Court where the appellants attacked the validity of the temporary custody order of the Pulaski County Juvenile Court for want of formal hearing and notice of a hearing to Donna Marie or Mrs. Brown, and without waiver from them as to notice of hearing. The validity of the Pulaski County Juvenile Court order placing temporary custody of the

child in the state Welfare Department is not actually before us on this appeal. No appeal was taken from that order but it would appear from the record before us, that the order was certainly open to attack. Even though Donna Marie was herself in apparent legal custody of the Welfare Department at the time the order was entered, she or her legal guardian was entitled to notice of hearing; she had no legal guardian and the juvenile court had no authority to appoint one for her. *Cude* v. *State,* 237 Ark. 927, 377 S.W. 2d 816. We hasten to point out that this is not an adoption case in any sense of the word and is not a proceeding for the appointment of a guardian. This is simply a habeas corpus case and we think the chancellor was correct in giving primary consideration to the best interest of the infant child.

Ths issues before the Garland County Chancery Court and the issues to which we address this opinion were clearly framed by the chancellor and agreed to by the appellants' counsel in language from the record as follows:

"THE COURT: All right. The Court is of the opinion in the first place that it has jurisdiction, not only to look into the validity of the Pulaski County proceeding on the habeas corpus but also to go beyond that and look into what is of the best interest of the child and I think that this is a different situation not one of the ordinary causes of habeas corpus where a man is imprisoned and in this issue there is more at stake than whether or not the Pulaski County Juvenile Court took proper action in what it did.

MR. DONOVAN: That's right.

THE COURT: So the Court is prepared to go into the whole matter. I'd like for all those who are to testify to please stand and be sworn."

At the hearing in chancery court Mrs. Brown testified that she herself was an adopted child of Julian and Marie Nabholz, having been adopted in 1937. She testified that she was 34 years of age; that she first married Tyrone Presley from whom she was divorced after two

years. She said she married Lawrence Schenck on August 14, 1957, lived with him eight years and was divorced from him in 1965. She said that following her divorce from Schenck and subsequent unsuccessful marriage to Joe Brown, she almost had a complete nervous breakdown requiring one week's hospitalization. She said that Donna Marie developed a reading problem in the second grade which retarded her progress in school, and did not improve in subsequent grades. She said she was concerned about Donna Marie "because she was at the stage of being boy crazy and was concerned that something could happen in that field," so she contacted the Child Welfare Department in connection with the problem. She said that she was told there was more than a possibility that Donna Marie could be gotten into "a reading foundation" if she was at the orphanage in Pulaski County, so she signed papers for Donna Marie to become a ward of the Child Welfare Division. On this point she said:

> "I signed the papers at the Court House so that they could take Donna. And like I said—Faulkner County. I did not go before a Judge or anything. There was no hearing on that. I just like a lot of people did not read the papers I signed. I believed they were telling me the truth."

Mrs. Brown then testified to visiting Donna Marie in the Florence Crittenton Home, where she remained until after she was delivered of child by caesarean section. She said she requested that Donna Marie be permitted to come home after the birth of the child but that the Welfare Department personnel threatened to not let Donna Marie come home at all unless she and Donna Marie signed papers releasing the child for adoption.

Mrs. Brown said that during the pendency of this litigation well-wishers in Faulkner County have given over $100 worth of baby clothes, a brand new baby bed and playpen, a stroller, a walker, jumpseat, baby bottles and a complete layette for a baby, and that she and Donna Marie are ready, able and willing to properly care for the infant child if it is returned to them. She said that she and her children are being supported by public welfare; that Donna Marie was born on

December 18, 1957, and is 14 years of age; that her next oldest child Edward, was born January 11, 1959 and is now 13 years of age; that her next oldest child Debra Lynn, was born December 26, 1960, and is now 11 years of age, and her youngest child, Julia Ann, was born March 17, 1963, and is now 9 years of age.

As to the health of her children, Mrs. Brown testified on direct examination as follows:

"A. Well, starting with Donna her health is perfrct. The only problem she has is her reading problem. She has a few little problems now that she—from childbirth—but she has no disease nor sickness that would keep her from school or anything. Eddie right now is having trouble. The doctor says that there is a possibility that he is on the seizure disorder, but they are trying to take a EEG if it's a possibility that it could be a brain tumor or blood clot. The boy did go into a seizure after he had one of his severe headaches that he's been having. Debbie—Eddie wears glasses. Debbie wears glasses. There's nothing else wrong with her. Eddie went—until he went out of school because of being sick, was a straight A student in school. Debbie doesn't do well in school but she's at the age where she's not interested. But sickness— Debbie just doesn't get sick. The only child that I have that's really sick is Julia Ann Schenck and she attends Faulkner County Day School for Crippled Children. She has cerebral palsy and she—her legs are weak and she has lost the use of one arm, but she's attended school for three years. She's been on medication ever since she was two years old. And she lives the life of a normal child actually.

Q. Have you spent considerable time taking this child to the Children's Clinic for braces and things of that kind?

A. Yes, sir, we took her to Greenville, South Carolina, one year, and she got her braces there at the Shriner's Hospital in Greenville, South Carolina. She's now

under the care of the Arkansas Crippled Children Clinic. She just had an eye operation, and it was very successful at the the Children's Hospital. She doesn't have to wear glasses any more. And she's seen at the University of Arkansas Medical Center besides the Arkansas Crippled Children's Clinic.

Q. And Eddie, was it yesterday that you took Eddie to the neurologist?

A. No, that was the day before. We called yesterday morning since the man who gives the EEG was unable to administer it. The Neurology Clinic said they'd have to wait till they get the result of this before they could actually give, you know, any definite answer on Eddie. That they needed the EEG, and I was promised that as soon as the man came back that they would get it as soon as possible."

On cross-examination Mrs. Brown testified that she was pregnant with Donna Marie when she was divorced from Pressley and married Schenck. She said she had been married to Presley for a period of two years when he got in jail and she obtained a divorce. She said she had been receiving food stamps from the Welfare Department when she and her children were living in a trailer furnished by her parents, but that she only started receiving cash payments from the Welfare Department in 1971. She said that her husband, Joe Brown, was hospitalized for serious injuries he sustained in a fight; that she is now separated from Brown and will obtain a divorce as soon as she can afford one. She said that since receiving cash money together with food stamps she has rented a nicer trailer in a better environment than the one furnished by her parents. She said it is her understanding that the money she receives from the Welfare Department is based on the number of dependents and that her cash payments now amount to $116 per month. She said she was paying $100 a month for rent on the trailer; that her child with cerebral palsy is in a special school and is required to take phenabarbital and tridione daily. She said her son Eddie has been placed on phenabarbital therapy and was given a three month supply of the medicine until it is thoroughly determined that it is what he needs for

his condition. She said her parents help out on the medical bills.

The substance of Mrs. Brown's testimony pertinent to Donna Marie's ability to care for her child is to the effect that in her opinion Donna Marie is thoroughly capable of being a mother to the infant child; that there is no question that she and Donna Marie together can do a good job of caring for the child; that the kind people of Conway have given her a baby bed and clothing for the child and with the continued assistance of the Welfare Department in food stamps and cash money, she feels that she and Donna Marie can make a satisfactory home in the trailer space she has available for the child, and that it would be to the best interest of all concerned if Donna Marie was awarded the custody of the child. Mrs. Brown said that besides the $116 in cash she receives from the Welfare Department, she also receives $148 worth of food stamps per month. She said that the trailer she now rents has two bedrooms with a couch that makes into a full bed. She said Donna Marie shares the double bed with her; that Debby and Julie, the two youngest children, share the other bedroom, and the livingroom couch is made into a bed for Eddie.

Donna Marie testified that she was born December 18, 1957, and was 14 years of age at the time she testified. She said that she never did get to hold her baby after it was born but that she would like to. She said she already knows how to do most things necessary in caring for a baby and that her mother would help her. She said if given the custody of the child, her mother could take care of it in the daytime while she is in school and that she could take care of it at night. She said she loves her child dearly and wants possession and custody of it.

Mr. Julian Nabholz testified that he adopted Mrs. Brown in 1937 when she was five weeks old; that she graduated from high school and attended Arkansas State Teacher's College. He testified as to Mrs. Brown's marriage to Schenck, the birth of the four children and the divorce from Schenck. He was then asked and answered the following questions:

"Q. How would this new baby if the court gives it to them today, how would it fit into the home?

A. Well, right now, I think they are just in the temporary ah—motel—I mean, house trailer.

Q. Yes, sir?

A. And until they find a bigger house, and I've got some property up on Beaver Fork Lake that I'd be willing to give them a deed with it.

Q. To build a home?

A. Build about a three bedroom house."

Mr. Nabholz testified that it was necessary for him and his wife to contribute substantially to Mrs. Brown and her children for food and clothing until they started receiving money from the Welfare Department, and that his and his wife's burden has been considerably relieved by the Welfare Department.

Mrs. Winburn, Social Worker for the state Welfare Department in Faulkner County, Dick Deitz, Child Services Field Supervisor in Faulkner County, Mrs. Mary Jane Moix, Social Worker in the Arkansas Department of Social Services for Faulkner County, Mr. Bryan David Cordell, Field Supervisor for the Family and Children's Division of the Arkansas Social Services, and Mrs. Darla Byers, Case Worker for the Family and Children's Services of the state Welfare Department, Mrs. Mary Jane Madigan, Supervisor of unmarried mothers for the Family and Children's Services, and Bobbie Smith, Executive Director of the Florence Crittenton Home, as well as Dr. John E. Peters and Cleo Goolsby, who interviewed Mrs. Brown and Donna Marie under direction of the chancellor, all testified under questioning by the chancellor as well as the attorneys. It would only lengthen this opinion to set out their testimony in detail but the substance of all of it is to the effect that Mrs. Brown is an unemployed mother of four dependent children, two of whom are afflicted, as already set out; that Mrs. Brown is totally over-

whelmed by the problems she already has, including her own marital problems past and present and, is totally unprepared mentally, physically and financially to take on the additional responsibility of properly caring for an infant child in her present surroundings. None of the social workers who have been involved in this case recommended awarding custody of the child to its mother and they all testified emphatically that it would be to the best interest of the child, and to the best interest of all parties concerned, that the custody of the infant not be awarded to the mother in this case. They all agreed that Donna Marie appears to have the normal intelligence of a 14 year old child but they all agree that she is less mature than the average child of her age, and is thoroughly incompetent to properly mother an infant child in her present circumstances and surroundings.

The chancellor's final order from whence comes this appeal recites as follows:

"Now on this 5th day of January, 1973, the Chancery Court of Garland County having received the depositions of Dr. John Peters and Miss Cleo Goolsby of the University of Arkansas Medical Center, Division of Child-Adolescent Psychiatry, and having given the depositions due consideration, and the Court having taken under advisement the evidence in this case and considering the evidence of Nancy L. Winburn, Richard Dietz, Mary Jane Moix, Bryan Cordell, Darla Byers, Mary Jane Madigan, Bobbie Smith, Estelene Duke, Mrs. Blake Browning, Donna Marie Schenck, Mary Ann Brown, Mr. Julian Nabholz, and other matters and things, this Court finds as follows:

1. The actual issue to be decided by this Court is the determination of ultimate custody, based upon the best interests of the child.

2. From the testimony and the Court's personal observations of the witnesses, the Court is of the opinion that Donna Marie Schenck is completely immature and unable to care for her child properly.

3. The court is of the opinion that Donna Marie Schenck would not in any way have objected to adop-

tion proceedings or otherwise attempted to regain custody of her child except for the pressure applied by her mother, Mary Ann Brown.

4. From the testimony and personal observations of Mary Ann Brown, the Court is of the opinion that she manifests substantial instability and is unable to cope with her past and present problems and would be unable to provide proper care for the child.

5. It would not be for the best interest of the child that it be raised in a family consisting of an unstable grandmother with marital problems, an immature fourteen year old mother, a thirteen year old uncle subject to epileptic seizures, an eleven year old aunt who is failing in school, and a nine year old aunt with cerebral palsy, all living in a mobile home and supported by Arkansas Social Services.

WHEREFORE, the Court finds that the petition for a Writ of Habeas Corpus should be denied and is hereby denied and custody of Patrick Daniel Schneck is confirmed in the Arkansas Social Services."

From the record before us we are unable to say that the chancellor's findings and order are against the preponderance of the evidence in this case. In the appellants' brief their attorney argues that the basic problem of the family is poverty and we are urged to grant the petition for habeas corpus on trial de novo. He argues as follows:

"Habeas Corpus should be granted, and the Order of the Chancellor denying the writ should be reversed, together with an immediate mandate vesting custody of Patrick Daniel Schenck in his mother, Donna Marie Schenck, as she is now 16 years of age, *and married*." (Our emphasis).

At another point in appellants' brief appears this statement:

"She is now two years older, and is now 16 years of age, and, is now married."

If Donna Marie has married and now has a home of her own, such evidence is not in the record now before us and we, of course, are confined to the record. If Donna Marie's present age and marital status have brought about such change in condition that would justify a change in custody, there is nothing to prevent her from presenting such evidence as may now be available but, from the record before us, it would appear that the Chancery Court of Garland County would be the proper forum in which to present such evidence.

The order of the chancery court is affirmed on the record now before us.

Affirmed.

BYRD, J., dissents.

CONLEY BYRD, Justice, dissenting. Sometime ago I employed a contractor to do some clearing for me with a bulldozer. The hire of the machine together with an operator was approximately fifty cents per minute. During the clearing operation a mother hen, of the bantam variety, attacked the bulldozer with such ferociousness that it attracted not only my attention but that of my dogs and a horse in the vicinity. I still remember how my heart leaped with joy when the operator, with a kindly smile, stopped the dozer for three or four minutes to let the hen remove her day-old brood from the path of the dozer. It was such a graphic demonstration of the unselfish devotion of motherhood to its offspring that it reminded me of the incident before King Solomon where the real mother quickly consented that her child be given to an impostor rather than have it split between the mother and the other claimant of the child. I'm sure that my brethren in the majority have all had as many graphic demonstrations as I of the response of motherhood and that in reaching their conclusions they have done as much soul searching in arriving at their conclusions. Having heard their discussions in this matter, I must admit that there is some practicality to their approach. I probably would have acquiesced in their considered judgment had the majority opinion given visitation rights to Donna Marie.

However, in my conscience, the Child Welfare Department's protestations of benevolence and goodness cause me to wake up at night. I keep thinking to myself that if a thief had secretly taken Donna Marie's baby from the hospital without her knowledge, every lawman, judge and householder in this state would have looked far and wide for Donna Marie's baby, and, when it was found, each and every citizen would have expected and wanted the baby to be returned to Donna Marie. Yet, when the Child Welfare Department, an arm of the State of Arkansas, without notice or due process obtains a spurious probate order and just as silently takes Donna Marie's baby, we as judges, instead of seeing that Donna Marie's baby is returned to her, stop to see if Donna Marie is a fit and proper mother and whether she can properly care for the child. It may be that Donna Marie appears too immature to properly care for her baby, but the record amply illustrates that she has that something which, despite her poverty and immaturity, has pulled together some friends and a capable lawyer to give their time to try to help her get her baby that was silently taken from her by a prestigious agency bespeaking goodness and benevolence. In making this appraisal I hope that I'm not overlooking the practical effects of life for the sympathy that I find in my heart and conscience.

One other reason impels me to register a dissent to the procedures here approved—*i.e.*, there will just as surely be other Donna Maries but now the Child Welfare Department will have one more lever to coerce the next Donna Marie to sign a "consent to adoption." The Department can now authoritatively point to this decision and tell all future Donna Maries that they may as well sign the "consent to adoption" because if they don't, the Department can take the baby anyway.

Perhaps I am too sympathetic toward motherhood, however, as between the mother and one who takes her baby away without her consent and without notice it appears that some law of nature ought to favor the mother and discourage those who unlawfully take a baby whether the latter be a common thief or a prestigious state agency

—at least until such time as the mother has had an opportunity to demonstrate her fitness or unfitness.

For the reasons herein stated, I respectfully dissent.